## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Joseph Mack, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as Rolling Farms Café, 4000 Eastern Sky Drive, Suite 4 and Suite 5, Traverse City, MI 49684, hereinafter "PREMISES," further described in Attachment A, for the things described in Attachment B.

2.      I am a Special Agent with the Internal Revenue Service Criminal Investigation (IRS-CI) and have been since 2022. I became a Special Agent with the IRS-CI after receiving approximately 26 weeks of basic training at the Federal Law Enforcement Training Center in Glynco, GA.  This training covered many aspects of conducing financial investigations, including but not limited to:  a) identifying the means and techniques by which persons engaged in criminal activities derive, launder, conceal, and spend illegally-obtained proceeds and use their businesses and assets to facilitate unlawful activities; b) the preparation of affidavits in tax and non-tax investigations in support of the seizure of financial and tax records, ledgers, books, cash and other valuables, documentation reflecting tax and non-tax violations; and c) reviewing records pertaining to the acquisition and ownership of assets.

3.      Prior to becoming a Special Agent with IRS-CI, I was employed as a police officer with the University of Maryland, College Park Police Department (UMPD) for five years. There, I completed approximately 29 weeks of training at the UMPD Police Academy, which was accredited by the Maryland Police Training Commission. This training covered traffic and criminal law, criminal investigations, criminal procedure, and crime scene processing. During my

employment with UMPD, I served as Detective in the Criminal Investigations Unit. I received numerous specialized trainings as a Detective, including successfully completing advanced interview and interrogation training, advanced cellphone location data training, and electronic device seizure and preservation training. During my tenure as a Detective, I conducted major felony investigations, including but not limited to, cybercrime, identity theft, embezzlement, sexual assault, and death investigations. While serving as a Detective, I authored and executed more than 10 court approved search and seizure warrants. I have testified in the District Court of Maryland and in the Circuit Court for Prince George's County, Maryland on multiple occasions. In 2016, I received a Bachelor of Arts degree in Arabic from University of Maryland, College Park. In 2021, I received a Bachelor of Science degree in Accounting from University of Maryland Global Campus.

4.      I am being assisted in this investigation by my on-the-job instructor, IRS-CI Special Agent Jeremiah Krimm. In this affidavit for probable cause, I am relying, in part, on the expertise and experience of Special Agent Krimm as well as other law enforcement personnel. Special Agent Krimm has been employed by IRS-CI since 2017 and has completed all phases of criminal investigator training at the Federal Law Enforcement Training Center, including training in search and seizure. Special Agent Krimm has conducted and assisted various criminal investigations of federal law as an IRS-CI Special Agent concerning Titles 18 and 26 of the United States Code.

5.      I have experience in conducting surveillance, executing search and arrest warrants, debriefing defendants and witnesses about criminal activities, and investigating financial crimes

and tracing the proceeds of criminal activities.  Based upon my training and experience and that of Special Agent Krimm, I know that individuals involved in restaurant businesses often maintain several years of financial records, property records, and records containing personally identifying information at their place of business.  Similarly, I know that business owners often maintain years' worth of employee records within their business.  From my training, experience, and discussions with other agents, I also know that financial, property, and business records are regularly maintained by individuals on computers, hard and external drives, optical discs, and other electronic devices that store data, and which are commonly found in both businesses and residences.

6.     Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known concerning this investigation.  Rather, I have set forth only the facts believed to be necessary to establish probable cause that evidence of violations of Title 26 U.S.C. Section 7203 and Title 26 U.S.C. Section 7202, are located at 4000 Eastern Sky Drive, Suites 4 and 5, Traverse City, MI 49684 – the PREMISES.

## PROBABLE CAUSE

7.     For the past five months, I have been investigating the criminal activities of Christopher Roehler in reference to alleged violations of Title 26, United States Code, Section 7203, failing to file income tax returns, and of Title 26, United States Code, Section 7202, failing to collect and pay over employment taxes since at least 2010. The investigation discovered Christopher Roehler purchased a $655,000.00 home in November of 2021. Agents have not

located a mortgage for the purchased home. Furthermore, the investigation has uncovered evidence that Christopher Roehler opened two restaurant ventures in 2020 and 2021, respectively. Despite these large cash outlays, Christopher Roehler has not filed any federal income tax returns since at least 2010.

8.      Christopher Roehler is associated with several different business entities registered with the State of Michigan and the IRS, including Rolling Farms Café, Rolling Farms LLC, Kingsley Tavern, doing business as Judson Market and Restaurant, JWD 413 LLC, GA 7 LLC, and GA Twenty Three LLC. Below is a chart summarizing information from the Michigan Department of Licensing and Regulatory Affairs (LARA) related to Roehler's businesses.

| Information from Michigan Department of Licensing and Regulatory Affairs (LARA) | | | | |
|---|---|---|---|---|
| Entity Name | Date Established | Most Recent Registered Agent | Last Annual Report Filing | Standing |
| Rolling Farms Café LLC | 9/2/2009 | Laura Roehler | 2020 | Not in Good Standing |
| Rolling Farms LLC | 5/10/2010 | Laura Roehler | 2020 | Not in Good Standing |
| GA 7 LLC | 9/2/2009 | Laura Roehler | 2021 | Perpetual |
| JWD 413 LLC | 6/12/2020 | Eric L. Ranieri, Esq. | None Filed | Not in Good Standing |
| GA Twenty Three LLC | 6/10/2020 | Eric L. Ranieri, Esq. | None Filed | Not in Good Standing |
| Kingsley Tavern LLC | 2/8/2017 | Eric L. Ranieri, Esq. | 2020 | Not in Good Standing |

9.      Specifically, Christopher Roehler is the operator and an owner of Rolling Farms Café located in Traverse City, MI. Rolling Farms Café is a restaurant located within an office park that is open for breakfast and lunch during the week and closed on weekends. Rolling Farms Café was registered as a company with the State of Michigan on September 8, 2009. An article in the Northern Express dated October 11, 2010 reported "…Chris Roller, who co-owns the restaurant with other family members." An article in the Northern Express dated April 5, 2015 reported "For

Chris Roller and his crew, the farm to table movement is old hat. They've been a part of it since they opened Rolling Farms Café in 2009."

10.     Articles in local publications also indicated Christopher Roehler owned the J. Wall Diner (business name JWD 413 LLC) and Judson Market & Restaurant (business name Kingsley Tavern) in Kingsley, MI. An article in the Northern Express dated January 18, 2020 titled "Kingsley's Judson Market & Restaurant" reported "The Northern Express talked with Mark Dunham, the Great Lakes Culinary Institute alumnus who helped owner, Chris Roehler (who also owns Rolling Farms Café in Traverse City), open the new venue…" The article went on to explain "…Thanks to the well-honed organizational skills of owner Chris Roehler, there are precise systems in place here…" An article in the Northern Express dated August 26, 2021 reported "A new restaurant that's been in the works for at least a year…has opened its doors in downtown Kingsley. Chris and Rebecca Roehler – owners of Rolling Farms Café in Traverse City, and Judson Market & Restaurant in Kingsley – have launched J. Wall Diner…" J. Wall Diner and Judson Market & Restaurant  appear to have since closed given that new restaurants are currently operating in both locations.

11.     In 2022, IRS-CI Special Agents observed complaints on social media from former employees of Rolling Farms Café. The complaints alleged that Christopher Roehler failed to issue Forms W2, Wage and Tax Statements, to employees and also failed to pay some employees.

12.     The initial complaints on social media viewed by agents included allegations that Christopher Roehler failed to issue Forms W-2 to employees and failed to pay employees' earned

wages. For example, a post created on March 21, 2020 by user "Jill Nance" wrote about failing to be paid by "Chris Roehler" for work at Rolling Farms Café. The post was commented on 397 times; many commentors shared similar experiences as the poster. In the comments on the original post, "Jill Nance" commented "Hey guys, this guy Ryan is trying to get me to take his [sic] down, says "he'll handle it". – What should I do? Just kidding, I will when all these people get their final checks and W2s and what is a clear pattern on behalf of Chris Roehler is remedied." "Jill Nance" also posted an apparent screenshot of a Gmail email message from Rolling Farms Café in the comments section. The resolution of the email screenshot is low; however, I was able to read some of the text. The legible portion of the posted email reads "Hi again Chris, per your request I sent the envelope with my address and postage. It seems you've had those for about seven or eight days maybe longer. When can I expect to receive the check?" A reply from Rolling Farms Café is also legible, reading "I will check on it." These comments were posted sometime in the spring of 2020. Another poster commented, "I worked for this guy for 3 years at rolling farms. Watched countless people try to retrieve their w2s or last paychecks just to have him tell them "oh I mailed it out" or "yeah I haven't printed them yet."" This comment was also made some time in the spring of 2020. In 2019,  a Facebook page for Judson Market and Restaurant – another business associated with Roehler – was created. Based upon the posted email exchange with a possible former employee, a possible former employee's reference to printed Forms W-2, and the Judson Market and Restaurant Facebook page, it is apparent based on the investigation that

Christopher Roehler uses a computer for business purposes. I also know from my training and experience that Gmail is available in a mobile application for cell phones.

13.     Agents also observed another post and comment thread concerning Christopher Roehler and J Wall Diner (business name JWD 413 LLC) on social media. In a post on June 28, 2022, user "Derick Ridge" posted 14 text message screenshots along with a message that included "…CHRIS ROEHLER DOES NOT PROPERLY PAY HIS WORKERS!!!!!!...I was the cook at Jwall Diner for a bit, until I had a seizure that put me in the hospital for a couole [sic] weeks causing them to close down. I have a 40hr work week that was supposed to be paid to me on the 6th with everyone elses last check. Ive still not seen this…" The post was commented on 167 times; many of the commentors wrote about similar experiences to those of the poster. The screenshots of text messages appear to show "Derick Ridge" texting a contact named "Chris" seeking payment. The screenshots do not show any response from "Chris." Also included among the text message conversation is an image of what appears to be a timesheet. The image depicts a small piece of paper that appears similar to a receipt. At the top of the paper is the title "Clock Out report for Derick." Below the title line, the paper has the following written on it; "Shift Started at Saturday, May 21, 2022 – 12:02:03 PM Shift Ended at Saturday May 21, 2022 – 9:28:43 PM." The paper appears to have been printed from a computerized device and is not handwritten. The formulaic presentation and specific information on the "Clock Out report for Derick" indicates it was generated from a computer system used to track employees' hours worked. Furthermore, the

text message screenshots indicate Christopher Roehler sometimes uses a cell phone to communicate with employees.

14.     A search of internal IRS databases showed that, in 2021, an individual named Derick Ridge reported a Form W-2 from JWD 413 LLC, the business name that operates the J Wall Diner. Searches of IRS databases did not show any taxpayer named "Jill Nance" in Michigan, indicating to me that the Facebook user account referenced above is likely held in a pseudonym.

15.     In August of 2007, Christopher Roehler and his business, Picnic Company Gourmet Café, became the subject of an IRS-CI criminal investigation in Washington state. The investigation focused on similar alleged violations as those under investigation here, namely, Title 26, United States Code, Section 7202, Failure to Report and Pay Over Employment Taxes. In October 2010, the investigation was closed without a prosecution recommendation. The prior case agent advised me that, during that investigation, agents recovered relevant business records during the execution of search warrants at Christopher Roehler's home and business. The agent recalled the investigation was unable to proceed, however, after agents were unable to decrypt electronic files seized during the search warrants. This investigation was not uncovered until after agents began this investigation after viewing social media complaints concerning Christopher Roehler.

16.     Searches of internal IRS and Records of Michigan Department of Licensing and Regulatory Affairs (LARA) databases further link  the businesses discussed above  with

Christopher Roehler. For example, IRS records showed GA Twenty Three and JWD 413 LLC were associated with "Chris R Roehler Sole Mbr". The aforementioned article from Northern Express identified Christopher Roehler as the owner of Kingsley Tavern LLC, doing business as Judson Market and Restaurant. The chart above summarizes LARA's records concerning these entities.

17.     Grand Traverse County Register of Deeds Records show J. Wall Diner as the current owner of 413 West Main Street, Kingsley, MI 49649. This is the former location of J. Wall Diner. During the time that it was in business, J. Wall Diner did not file Forms 941 nor pay over employment taxes.

18.     As indicated in the chart above, several of Christopher Roehler's businesses show Laura Roehler as the registered agent. Laura Roehler is Christopher Roehler's mother. Laura Roehler is 86 years old. There are no vehicles registered to Laura Roehler. Laura Roehler also uses her married last name, Carmean. Agents have been unable to verify Laura Roehler's current location or residence. Laura Roehler's 2021 tax refund check was deposited into her account by Byrch Roehler, her son. Laura Roehler's 2022 tax refund check remains uncashed or deposited despite being mailed in March of 2023. A search of the State of Michigan's Vital Records did not unearth any death certificate for Laura Roehler.

19.     The most recent Annual Reports for each of Laura Roehler's entities shown in the chart above all show that the street address of the registered office is 4000 Eastern Sky Drive, Suite

4, Traverse City, MI 49864 – the PREMISES. The Annual Reports are electronically signed by Laura Roehler or "L Roehler," as "Manager," "Member," or "Authorized Agent."

20.     In August of 2010, Rolling Farms LLC acquired a residence and approximately 70 acres of land located at 3163 East Bodus Road, Cedar, Michigan 49621. This address was never a business location for Rolling Farms Café. Instead, the address appears on Christopher and Rebecca Roehler's Michigan Driver's License histories as a previous residence.

21.     Grand Traverse County Register of Deeds records indicate 4000 Eastern Sky Drive, Suite 4, Traverse City, MI 49684 (the PREMISES) was bought by GA 7 LLC in January of 2010 for $205,000.00. In February of 2010, GA 7 LLC took out a mortgage for $164,000.00 from Traverse City State Bank.

22.     On October 23, 2023, I searched LARA and IRS records for any unidentified filings associated with Christopher Roehler's businesses. I did not find any new filings in either LARA or IRS records.

**Individual Tax Returns**

23.     Christopher Roehler and his wife, Rebecca Roehler, have not filed any Forms 1040, U.S. Individual Income Tax Returns, since at least 2015. An individual is required to file a tax return with the IRS if they earn gross income that is above a certain threshold amount each year. The threshold varies, depending on the individual's age and the filing status they elect to use on their return. Generally, the married filing jointly threshold is the highest, and thus most favorable, to married individuals. Christopher Roehler and Rebecca Roehler were married from at least 2015

10

through 2022 and thus could have elected the married filing jointly status during that time. Based on a review of the evidence obtained thus far, Christopher Roehler and Rebecca Roehler collectively earned taxable income that exceeded the gross income filing thresholds for the married filing joint status for tax years 2015 through 2022, most of which originated from Rolling Farms Café. This evidence includes the following: (1) neither filed for unemployment benefits during that time, and (2) they purchased a new home in 2021 for $655,000.00 and appear to have paid cash, as agents have been unable to locate a mortgage for the residence. It is reasonable to believe that Christopher Roehler knew that he and Rebecca Roehler earned this income because they benefited from it by being able to make the referenced personal expenditures.

24.     Meanwhile, Laura Roehler, Christopher's mother, has consistently filed Forms 1040. For example, in 2013, 2014, and 2015, Laura Roehler reported income from Rolling Farms Café LLC as a Schedule C Sole Proprietorship. In 2013, Laura Roehler reported gross business receipts of $548,440.00 and a net profit of $187.00. In 2014, Laura Roehler reported gross business receipts of $1.00 and a net loss of $337.00. In 2015, Laura Roehler reported gross business receipts of $1.00 and a net business loss of $200.00. Since at least 2013, Laura Roehler has reported GA 7 LLC on a Schedule E attached to her Forms 1040. In 2015, Laura Roehler began reporting income from GA 7 LLC. Below are summaries of Laura Roehler's Forms 1040 and Schedule E filings from 2013 to 2022 and a summary of Laura Roehler's Schedule C filings.

| Laura Roehler Form 1040 U.S. Individual Income Tax Return Summary 2013-2017 | | | | | |
|---|---|---|---|---|---|
| Tax Year | 2013 | 2014 | 2015 | 2016 | 2017 |
| Taxable Interest | $ 25.00 | $ 1.00 | $ 7.00 | $ 0.00 | $ 389.00 |
| Business Income or (Loss) | $ 187.00 | $ (337.00) | $ (200.00) | $ 0.00 | $ 0.00 |
| Pension and Annuities | $ 91,856.00 | $ 97,946.00 | $ 92,486.00 | $ 94,126.00 | $ 95,800.00 |
| Rental Real Estate, Royalties, Partnerships, S Corporations, Trusts, Etc. | $ 0.00 | $ 0.00 | $ 0.00 | $ 1,563.00 | $ 1,828.00 |
| Social Security | $ 22,518.00 | $ 22,855.00 | $ 23,242.00 | $ 23,242.00 | $ 23,310.00 |
| Total Income | $ 114,586.00 | $ 120,465.00 | $115,535.00 | $118,931.00 | $121,327.00 |
| Less: Deductions | $ (16,034.00) | $ (15,803.00) | $(16,273.00) | $(16,946.00) | $ (6,531.00) |
| Less: Exemptions | $ (3,900.00) | $ (3,950.00) | $ (4,000.00) | $ (4,050.00) | $ (4,050.00) |
| Taxable Income | $ 94,465.00 | $ 100,712.00 | $ 95,262.00 | $ 97,935.00 | $110,746.00 |

| Laura Roehler Form 1040 U.S. Individual Income Tax Return Summary 2018-2022 | | | | | |
|---|---|---|---|---|---|
| Tax Year | 2018 | 2019 | 2020 | 2021 | 2022 |
| Taxable Interest | $ 69.00 | $ 160.00 | $ 134.00 | $ 169.00 | $ 965.00 |
| Business Income or (Loss) | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 |
| Pension and Annuities | $ 96,498.00 | $ 98,229.00 | $ 98,959.00 | $100,747.00 | $101,511.00 |
| Rental Real Estate, Royalties, Partnerships, S | $ 1,229.00 | $ 1,316.00 | $ 1,655.00 | $ 2,137.00 | $ 2,151.00 |
| Social Security | $ 23,782.00 | $ 24,444.00 | $ 24,834.00 | $ 25,155.00 | $ 26,646.00 |
| Total Income | $ 121,578.00 | $ 124,149.00 | $125,582.00 | $128,208.00 | $131,273.00 |
| Less: Deductions | $ (13,300.00) | $ (13,500.00) | $(13,700.00) | $(13,900.00) | $(14,350.00) |
| Taxable Income | $ 108,278.00 | $ 110,649.00 | $111,882.00 | $114,308.00 | $116,923.00 |

| Laura Roehler Form 1040 U.S. Individual Income Tax Return Schedule C Summary 2013-2015 Business Name: Rolling Farms Cafe LLC | | | |
|---|---|---|---|
| Tax Year | 2013 | 2014 | 2015 |
| Gross Receipts | $ 548,440.00 | $ 1.00 | $ 1.00 |
| Cost of Goods Sold | $ 226,014.00 | $ 1.00 | $ 1.00 |
| Wages | $ 199,786.00 | $ 0.00 | $ 0.00 |
| Total Expenses | $ (322,239.00) | $ (337.00) | $ (200.00) |
| Net Profit | $ 187.00 | $ (200.00) | $ (200.00) |

| Laura Roehler Form 1040 U.S. Individual Income Tax Return Schedule E Summary 2013-2017 Partnership Name: GA 7 LLC | | | | | |
|---|---|---|---|---|---|
| Tax Year | 2013 | 2014 | 2015 | 2016 | 2017 |
| Passive Income from Schedule K-1 | $ 0.00 | $ 0.00 | $ 0.00 | $ 1,229.00 | $ 1,086.00 |
| Passive Loss Allowed | $ 0.00 | $ 0.00 | $ 0.00 | $ (673.00) | $ 0.00 |
| Total Partnership and S Corporation Income (Loss) | $ 0.00 | $ 0.00 | $ 0.00 | $ 556.00 | $ 1,086.00 |

| Laura Roehler Form 1040 U.S. Individual Income Tax Return Schedule E Summary 2018-2022 Partnership Name: GA 7 LLC | | | | | |
|---|---|---|---|---|---|
| Tax Year | 2018 | 2019 | 2020 | 2021 | 2022 |
| Passive Income from Schedule K-1 | $ 1,229.00 | $ 1,316.00 | $ 1,655.00 | $ 2,137.00 | $ 2,151.00 |
| Passive Loss Allowed | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 |
| Total Partnership and S Corporation Income (Loss) | $ 1,229.00 | $ 1,316.00 | $ 1,655.00 | $ 2,137.00 | $ 2,151.00 |

## Business Tax Returns

25.     All businesses registered with the IRS must file annual tax returns. The type of tax return required to be filed is maintained in the IRS's records and is based on a number of factors, including but not limited to income, number of employees, and type of business. Rolling Farms Café, Rolling Farms LLC, JWD 413 LLC, Kingsley Tavern LLC, GA 7 LLC, GA Twenty Three LLC, are all registered with the IRS and are identified by employer identification numbers issued

13

by the IRS. As businesses, each company is required to file an annual income tax return, except partnerships which must file informational returns. The following paragraphs reference tax returns required of each business according to internal IRS records.

26.     Rolling Farms LLC was established as a company with the State of Michigan on May 11, 2010. Rolling Farms Café LLC is required to file four types of forms with the IRS annually – Forms 1065 U.S. Return of Partnership Income (Forms 1065), Forms 940 Employers Annual Federal Unemployment Tax Return (Forms 940), Forms 944 Employer's Annual Federal Tax Return (Forms 944), and Forms 941 Employer's Quarterly Federal Tax Return (Forms 941). Rolling Farms Café has not filed any Forms 1065 from 2016 to the present. Likewise, Rolling Farms Café failed to file Forms 941 and pay employment taxes from at least the first employment tax quarter of 2015 through at least the second quarter of 2023.

27.     In 2015 and 2018, however, Rolling Farms Café LLC filed Forms W2 Earnings and Tax Statement (Forms W2) for employees with the Social Security Administration (SSA). In total in 2015 and 2018, Rolling Farms Café LLC filed 40 Forms W2 Earnings and Tax Statement (Forms W2). The chart below details the differences between what was reported by employees on their personal income tax returns compared to what Rolling Farms Café filed with the SSA. Christopher Roehler, as an owner and the operator of Rolling Farms Café from at least 2015 to the present, is responsible for accounting for and paying over employment taxes. Based upon employees' reported withholding, it appears Christopher Roehler withheld taxes from employees yet failed to pay it over to the IRS. IRS records also showed Rolling Farms Café to be affiliated

14

with Laura R Roehler Mbr. Laura Roehler was the signatory on state corporation filings between 2015 to the present. Additionally, a credit card processor account with JP Morgan Chase Bank for Rolling Farms Café was held in Laura Roehler's name from January 1, 2017 to April 22, 2022. Based upon these factors, Laura Roehler may also be a party responsible for accounting for and paying over employment taxes.

| Year | Number of Taxpayer Reported Forms W-2 | Number of SSA Reported Forms W-2 | Taxpayer Reported Form W-2 Withholding | Total SSA Reported Form W-2 Withholding | Total Taxpayer Reported Wages | Total SSA Reported Wages |
|---|---|---|---|---|---|---|
| | | | Rolling Farms Café Employee and SSA Reported Form W-2 Wage and Earning Statement Comparison 2015-2022 | | | |
| 2015 | 25 | 40 | $ 13,850.00 | $ 15,759.00 | $ 208,496.00 | $ 246,627.00 |
| 2016 | 19 | 0 | $ 15,518.00 | $ 0.00 | $ 221,661.00 | $ 0.00 |
| 2017 | 19 | 0 | $ 12,213.00 | $ 0.00 | $ 194,490.00 | $ 0.00 |
| 2018 | 17 | 40 | $ 13,935.00 | $ 14,833.00 | $ 194,671.00 | $ 243,151.00 |
| 2019 | 19 | 0 | $ 14,166.00 | $ 0.00 | $ 199,006.00 | $ 0.00 |
| 2020 | 12 | 0 | $ 13,792.00 | $ 0.00 | $ 167,132.00 | $ 0.00 |
| 2021 | 12 | 0 | $ 9,109.00 | $ 0.00 | $ 164,035.00 | $ 0.00 |
| 2022 | 18 | 0 | $ 5,687.00 | $ 0.00 | $ 121,105.00 | $ 0.00 |

28.     In November of 2018, the IRS examined Rolling Farms Cafe's filing history for 2015. There were no Forms 940 or 941 filed for tax year 2015. The examination resulted in substitute tax returns being filed by the IRS on behalf of Rolling Farms Café. The substitute returns resulted in the IRS assessing Rolling Farms Café tax of $62,078.72.

29.     According to IRS records, GA 7 LLC is also required to file Forms 1065 with the IRS. GA7 LLC filed a Form 1065 with the IRS in 2015 in which it reported total assets of $175,004.00 and net income of $4,387. The net income was reported to have come from rental income. According to the 2015 Form 1065, GA 7 LLC has five partners. The partners were Laura Carmean, Raymond Roehler, John Roehler, William Roehler, and Henry Roehler. Raymond

Roehler and John Roehler are Christopher Roehler's children. At the time of the filing of the Form 1065, Raymond Roehler was 12 years old and John Roehler was 10 years old. Agents could not confirm the identities of William Roehler and Henry Roehler. GA 7 LLC has failed to file Forms 1065 with the IRS from 2016 through 2022.

30.    In 2020, a Form SS-4 Application for Employer Identification Number was filed with the IRS for JWD 413 LLC. The filing noted the executor's name as "Chris Roehler Sole MBR". JWD 413 LLC did business as J. Wall Diner. According to IRS records, JWD 413 LLC is required to file Forms 940 with the IRS. JWD 413 LLC has failed to file Forms 940 with the IRS from 2020 through 2022. Furthermore, JWD 413 LLC has not filed Forms 1065 with the IRS despite being required to do so.

31.    In 2021 and 2022, employees reported earning wages from JWD 413 LLC. However, JWD 413 LLC never filed any required employment tax returns nor paid over any taxes withheld from employees' checks. The chart below shows a comparison of employees' reported wages and Forms W-2 to those filed with the Social Security Administration.

| JWD 413 LLC (DBA J. Wall Diner) Reported Form W-2 Wage and Earning Statement 2021-2022 | | | | | |
|---|---|---|---|---|---|
| Year | Number of Taxpayer Reported Forms W-2 | Number of SSA Reported Forms W-2 | Taxpayer Reported Form W-2 Withholding | Total SSA Reported Withholding | Total Taxpayer Reported Wages | Total SSA Reported Wages |
| 2021 | 3 | 0 | $ 2,327.00 | $ 0.00 | $ 26,192.00 | $ 0.00 |
| 2022 | 1 | 0 | $ 25.00 | $ 0.00 | $ 5,143.00 | $ 0.00 |

32.    In 2020, a Form SS-4 Application for Employer Identification Number was filed with the IRS for GA Twenty Three LLC. The filing noted the business's trade name was "Chris R Roehler Sole MBR" and the principal merchandise sold was to be "Retail Fast Food." According

to IRS records, GA Twenty Three LLC is required to file Forms 940 and Forms 944 with the IRS. GA Twenty Three LLC has failed to file Forms 940 and Forms 941 with the IRS from 2020 through 2022. IRS records did not indicate GA Twenty Three LLC was required to file Forms 1065 with the IRS during this same time period.

33.     In 2017, a Form SS4 Application for Employer Identification Number was filed with the IRS for Kingsley Tavern LLC. The filing noted the business's trade name was "Paul Bandrowski MBR." According to IRS records, Kingsley Tavern LLC, doing business as Judson Market and Restaurant, is required to file Forms 1065, Forms 940, and Forms 941 with the IRS. Kingsley Tavern LLC has never filed any Forms 1065 with the IRS. Kingsley Tavern LLC likewise did file the required Forms 940 and Forms 941 in 2021 and 2022.

34.     Based upon my training, experience, and knowledge of the investigation, however, the businesses above earned sufficient income to require them to file returns with the IRS. This is based in part on company records obtained from third party sources. For example, the chart below shows the credit card receipts reported to the IRS by third party credit card processors and subsequently paid to the entities associated with Christopher Roehler.

| Summary of 1099-K Filings with IRS to Entities Associated with Christopher Roehler | | | |
|---|---|---|---|
| | Rolling Farms Café | Judson Market and Restaurant | J Wall Diner |
| 2011 | $ 255,211.00 | | |
| 2012 | $ 298,005.00 | | |
| 2013 | $ 358,352.00 | | |
| 2014 | $ 362,890.00 | | |
| 2015 | $ 402,801.00 | | |
| 2016 | $ 463,298.00 | | |
| 2017 | $ 446,048.00 | | |
| 2018 | $ 440,495.00 | $ 404,388.00 | |
| 2019 | $ 428,116.00 | $ 638,101.00 | |
| 2020 | $ 335,135.00 | $ 282,092.00 | |
| 2021 | $ 375,868.00 | $ 258,448.00 | $ 41,957.00 |
| 2022 | $ 433,071.00 | $ 150,287.00 | $ 41,663.00 |
| Totals | $ 4,599,290.00 | $ 1,733,316.00 | $ 83,620.00 |

**Surveillance**

35.     IRS-CI Special Agents have observed Christopher Roehler routinely at the PREMISES.  Agents have observed Christopher Roehler operating a 2006 Blue BMW X3 SUV bearing Michigan license plate DE26076 registered to Rolling Farms LLC and a blue Honda CRV bearing Michigan license plate ETA3318 registered to Christopher Roehler. One or both of these vehicles are commonly parked adjacent to the PREMISES from approximately 6:30 a.m. until 6:00 p.m. daily. The café is open from 8:00 a.m. until 3:00 p.m.

36.     On March 9, 2023 at approximately 7:17 a.m., I observed the BMW SUV parked in a parking lot adjacent to the PREMISES.

18

37.     On March 13, 2023 at approximately 5:33 p.m., I observed the BMW SUV parked in the same parking space as on March 9, 2023.

38.     On May 10, 2023, agents observed Christopher Roehler from approximately 6:00 p.m. until approximately 7:41 p.m. Agents identified Christopher Roehler from a Michigan Driver's License photo and previous U.S. Probation photo. This photo was taken as a result of a federal conviction for drug trafficking in the 1990s. At approximately 6:00 p.m., agents observed Christopher Roehler walk from the area of the PREMISES to the BMW SUV. The BMW SUV was parked in the same parking space as noted on March 9 and March 13, 2023. At approximately 6:14 p.m., Christopher Roehler entered Gordon Food Service, a food and grocery wholesale store, located at 1781 Barlow Street, Traverse City, MI 49686. Christopher Roehler exited the store at approximately 6:33 p.m. and began loading bags and large cardboard boxes into the BMW SUV. Christopher Roehler then left Gordon Food Service and return to Rolling Farms Café at approximately 6:50 p.m. Back at the café, Christopher Roehler parked along the curb of Eastern Sky Drive and began carrying bags and large cardboard boxes from the BMW SUV into the lower level of Rolling Farms Café. At approximately 7:30 p.m. Christopher Roehler reentered the BMW SUV and left the business. Agents followed Christopher Roehler as he drove in Traverse City, MI but lost sight of his vehicle at approximately 7:41 p.m.

39.     On June 7, 2023, agents observed Christopher Roehler from approximately 5:45 p.m. until 8:12 p.m. At approximately 5:45 p.m., agents observed Christopher Roehler leave the PREMISES and enter the blue BMW SUV. The BMW SUV was parked in the same parking space

as noted on March 9, March 13, and May 10, 2023. At approximately 6:06 p.m., Christopher Roehler arrived at Costco Wholesale located at 125 East South Airport Road, Traverse City, MI 49686. Agents observed Christopher Roehler inside Costco Wholesale browsing the refrigerated products section of the store. At approximately 6:45 p.m., Christopher Roehler left Costco Wholesale with a grocery cart of purchases. At approximately 7:00 p.m., Christopher Roehler arrived at the PREMISES where he began bringing items from the BMW SUV into the PREMISES. Christopher Roehler parked at the rear of the PREMISES along the curb of Eastern Sky Drive. At approximately 7:21 p.m., Christopher Roehler left the PREMISES in the BMW SUV. A few minutes later, Christopher Roehler arrived at a Meijer store located at 3955 US 31, Traverse City, MI 49684. At approximately 7:50 p.m., Christopher Roehler left Meijer with several purchases. At approximately 7:57 p.m., Christopher Roehler arrived at Thai Kitchen located at 1133 West South Airport Road, Traverse City, MI 49686. At approximately 8:06 p.m., Christopher Roehler left Thai Kitchen carrying a bag. At approximately 8:12 p.m., Christopher Roehler arrived at his residence located at 1302 Peninsula Drive, Traverse City, MI.

40.     On June 30, 2023, at approximately 2:10 p.m., I observed Christopher Roehler exit the front west-facing door of the PREMISES and enter a blue Honda CRV in the west parking lot of the PREMISES. I observed the vehicle bore Michigan license plate 9LDX19 and a temporary registration in the rear window read 748503D. A subsequent database search revealed a Honda CRV was registered to Christopher Roehler on June 30, 2023. Christopher Roehler drove the vehicle to the parking lot next to the PREMISES where the BMW SUV was located and parked

20

immediately next to it. At approximately at approximately 3:33 p.m., I observed Christopher Roehler leave the PREMISES and enter the BMW SUV. The BMW SUV was parked in the same parking space as on March 9th, March 13th, May 10th, and June 7th.

41.     On July 26, 2023, at approximately 6:12 a.m., I observed a blue Honda CRV, now bearing Michigan license plate ETA3318, parked in the driveway of Christopher Roehler's residence, located at 1302 Peninsula Drive, Traverse City, MI 49686. A vehicle registration search revealed this vehicle is registered to Christopher Roehler.

42.     On July 27, 2023 at approximately 8:00 a.m., I observed the BMW SUV parked in the same parking space adjacent to the PREMISES as noted on March 9th, March 13th, May 10th, June 7th, and June 30th. At approximately 5:01 p.m., I observed Christopher Roehler walk from the direction of the PREMISES and enter the BMW SUV.

43.     On August 2, 2023, at approximately 11:10 a.m., I observed the BMW SUV parked in the same parking space adjacent to the PREMISES as on the previously noted dates. Shortly thereafter, I observed Rebecca Roehler walk from the west parking lot of the PREMISES in the direction of the BMW SUV. I then observed Christopher Roehler driving the Honda CRV from the west parking lot of the PREMISES towards Silver Lake Road. At approximately 11:15 a.m., I observed the Honda CRV following the BMW SUV at the intersection of Copper Ridge Drive and Silver Lake Road. Both vehicles were stopped at red light. The BMW SUV entered the intersection, against a red traffic light, and turned eastbound on Silver Lake Road. The Honda CRV, driven by Roehler, followed the BMW SUV, also failing to yield to the red traffic light.

21

44.     Using video surveillance, agents observed Christopher Roehler's residence in the months of May and June of 2023. Agents noted that Christopher Roehler commonly left the residence between approximately 6:00 a.m. and 6:30 a.m. and did not return until approximately 8:00 p.m. Christopher Roehler was the only person I observed operating the BMW SUV. Additionally, on several occasions, I observed Christopher Roehler return to the residence with bags of bulky items that appeared to be groceries. I did not observe Christopher Roehler carry documents to or from the residence. I did not observe Christopher Roehler carry any laptop computers or laptop-style bags to or from the residence.

45.     On October 17, 2023, at approximately 6:21 a.m., I observed Christopher Roehler's blue Honda CRV traveling south on Peninsula Drive in Traverse City, Michigan. I identified the vehicle from its Michigan registration, ETA 3318. I followed the vehicle until it arrived at the rear of the PREMISES along Eastern Sky Drive at approximately 6:30 a.m. I briefly lost sight of the vehicle but then observed it traveling down Eastern Sky Drive to Copper Ridge Drive. The vehicle traveled to the intersection of Copper Ridge Drive and Silver Lake Road where it stopped at a red light. While the light was still red, the vehicle turned left onto Silver Lake Road. I lost sight of the vehicle again until approximately 6:46 a.m. when the vehicle returned to the PREMISES. The vehicle stopped on Eastern Sky Drive next to the ground floor door to the PREMISES. I observed a white male, matching Christopher Roehler's description, exit the vehicle and go into the PREMISES. Roehler appeared to be able to enter the building on his own, without relying on someone else to let him in. Briefly after entering, Roehler returned to the vehicle, retrieved a box

from the passenger side of the vehicle, and reentered the PREMISES. At approximately 6:49 a.m., Roehler again came outside, got in the driver's seat of the vehicle, and drove south on Eastern Sky Drive. Moments later, I observed the vehicle parked in a parking lot next to the PREMISES.

46.     On October 23, 2023, Special Agent Frederick Pike (SA Pike) and I conducted surveillance of the PREMISES and Christopher Roehler. At approximately 2:55 p.m., I observed Rebecca Roehler driving a silver Mercedes SUV bearing Michigan registration EHZ0059. A later check of law enforcement records showed the Mercedes SUV to be registered to Christopher Roehler. Rebecca Roehler parked the Mercedes SUV immediately west of the PREMISES, facing the PREMISES. Approximately two minutes later, I observed a silver Volkswagen SUV bearing Michigan registration EPF1752 park one space south of the Mercedes SUV. A later check of law enforcement records showed the Volkswagen SUV to be registered to Christopher and Rebecca Roehler. Approximately one minute after arriving, a young-looking white male with long straight blonde hair exited the Volkswagen SUV and walked toward the PREMISES. The male with the long blonde hair appeared similar in appearance to one of Christopher Roehler's sons, who agents previously observed at Christopher Roehler's residence. At nearly the same time, a white male walked from the area of the PREMISES to the Mercedes SUV and entered the front passenger seat. The male who entered the SUV appeared similar to another one of Christopher Roehler's sons, who agents previously observed at Christopher Roehler's residence. The male who exited the Volkswagen SUV returned shortly thereafter from the direction of the PREMISES carrying a large brown paper bag. The Volkswagen SUV and Mercedes SUV then departed the parking lot

within ten minutes of their arrivals. Between 3:18 p.m. and 5:34 p.m., I observed three additional people exit from the area of the PREMISES. This included one male carrying a clear trash bag appearing to contain food waste to a nearby dumpster. During the same period, SA Pike observed a male carrying two trash bags walk from the south patio door of the PREMISES to a nearby dumpster. At approximately 5:34 p.m., SA Pike and I observed Christopher Roehler exit from the PREMISES and enter a blue Honda CRV, bearing Michigan registration ETA3318, parked west of the PREMISES. SA Pike and I followed Christopher Roehler as he drove to Costco. SA Pike and I observed Christopher Roehler shopping inside of Costco. While observing Christopher Roehler inside Costco, I saw at least five large containers similar to milk jugs, a large flat pack of water bottles, and a large package of toilet paper in Christopher Roehler's shopping cart. I observed Christopher Roehler leave Costco with a shopping cart full of purchases and load them into the Honda CRV. I then followed Christopher Roehler to a Gordon Food Service store. Christopher Roehler was inside of the store for approximately 14 minutes before exiting with a grocery cart full of purchases. SA Pike and I followed Christopher Roehler back to the PREMISES. I observed Christopher Roehler park outside the ground floor entrance door at the rear of the PREMISES. I observed Christopher Roehler make 12 trips while carrying items from the Honda CRV into the PREMISES. On Christopher Roehler's fifth trip from the vehicle into the PREMISES, I observed Christopher Roehler carrying a large package that appeared to be toilet paper. On Christopher Roehler's tenth trip from the vehicle into the PREMISES, I observed Christopher Roehler carrying

24

a large flat pack of water bottles. At approximately 7:13 p.m., SA Pike and I followed Christopher Roehler from the PREMISES to his residence at 1302 Peninsula Drive, Traverse City, MI 49686.

47.     During agents' observation of the PREMISES and Christopher Roehler's residence, agents have not seen any person fitting the description of Laura Roehler at Rolling Farms Café or Christopher Roehler's residence.

48.     During operating hours, the east-facing ground floor door of the PREMISES is routinely propped open. The ground floor door has "Suite 5" in gray lettering above the door. This door is located on the ground floor of the building and leads into the ground floor level which is different than the west and south facing doors of the business; which lead to the dining area. On several occasions I have been able to look inside from the street outside. Inside the ground level of the PREMISES, I observed a kitchen area and a closed door on the south wall of the space.

**Undercover Activity**

49.     In April of 2023, an IRS-CI undercover agent, hereafter referred to as the UCA, contacted Christopher Roehler to inquire if Christopher Roehler would be willing to sell Rolling Farms Cafe. The UCA conducted a recorded phone call with Christopher Roehler and met with Christopher Roehler inside of Rolling Farms Café. While inside the restaurant, the UCA observed business records and a computerized Point of Sale (POS) system. During both the recorded phone call, meeting in Rolling Farms Café, and follow up text messages exchanged between the UCA and Christopher Roehler, Christopher Roehler provided or the UCA was able to observe the following information about Rolling Farms Café:

a. Christopher Roehler told the UCA the POS system was a Harbortouch Brand system with a single controlling unit and multiple ancillary units. Christopher Roehler told the UCA that the POS was remotely accessible and remotely reprogrammable. Harbor Touch's website advertises that third party mobile applications are available "…from labor management to advanced inventory control."

b. Christopher Roehler told the UCA that Rolling Farms Café currently has approximately 10 employees, including two managers, but previously has employed up to 15 employees per shift.

c. Christopher Roehler told the UCA that employees of Rolling Farms Café continuously move cash from the register into a "different drawer" throughout the day.

d. Christopher Roehler told the UCA that Rolling Farms Café's sales consist of approximately 15% cash and 85% credit transactions.

e. Christopher Roehler told the UCA there are a few partners in the business and all of them are family members. Christopher Roehler also stated that he was the "figurehead" and "…deciding factor," apparently referring to the partnership of owners in Rolling Farms Cafe.

f. Christopher Roehler told the UCA that he owned the business suite occupied by Rolling Farms Café.

g. Christopher Roehler told the UCA he had recently sold two businesses and still owned the properties and buildings where the sold businesses had been located.

h. Christopher Roehler told the UCA that before the pandemic he had "…a lot of cash."

i. Christopher Roehler was evasive and reluctant to discuss gross receipts or sales figures with the UCA. Ultimately, Christopher Roehler did not disclose any gross receipts figures to the UCA. Christopher Roehler was also evasive and vague when discussing if he worked at home or was present at Rolling Farms Café every day.

j. Christopher Roehler told the UCA that he would sell Rolling Farms Café to the right person.

k. Christopher Roehler told the UCA that Rolling Farms Café was equipped with surveillance cameras that could be viewed remotely. From my training and experience, I know remote viewing of surveillance cameras is usually done via a mobile application on a cell phone.

l. Christopher Roehler told the UCA that there was small office located in Rolling Farms Café. Christopher Roehler also told the UCA that he does business tasks remotely.

m. The layout of Rolling Farms Café consists of two floors. The UCA entered the main floor of Rolling Farms Café. This main floor has one set of west facing doors with "Suite 4" written above the doors. Christopher Roehler showed the UCA both floors and several interior rooms. The main floor consists of a dining room, checkout counter, bathrooms, and employee area. Within the employee area, behind the checkout counter, on the main floor, there is a stairwell to the lower level. Within the lower level, there was a dishwashing station, storage room, walk-in freezer, and food preparation space. There is one exterior door leading outdoors from the lower level. When viewed from the outside, this door has "Suite 5" facing the exterior written on the window above the door in gray lettering, as though denoting a separate suite address. However, there is no separation between the upper and lower floors to indicate they are separate spaces.

n. The UCA communicated with Christopher Roehler via call and text at phone number 231-709-1756, indicating Christopher Roehler uses a cell phone to conduct business activities. A search of a law enforcement database showed phone number 231-709-1756 to be serviced by Verizon, a cellular network carrier.

## **TECHNICAL TERMS**

50.        Based on my training and experience, I use the following technical terms to convey the following meanings:

a. IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—

IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

b. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

c. Storage medium: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

d. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

e. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic films. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

f. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable

28

storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

g.   Tablet:  A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

51.   As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

52.   *Probable cause.*  I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.   Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a

computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

e.  Based on actual inspection of other evidence related to this investigation, the recorded statements of Christopher Roehler to the UCA, I am aware that computer equipment was used to generate, store, and print documents used in the tax evasion scheme. There is reason to believe that there is a computer system currently located on the PREMISES.

53.  *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a

30

file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.   Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline

31

information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

54.  *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or

32

imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage

media, and to prevent the loss of the data either from accidental or intentional destruction.  This is

true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

55.    *Nature of examination.*    Based on the foregoing, and consistent with Rule

41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying

storage media that reasonably appear to contain some or all of the evidence described in the warrant

and would authorize a later review of the media or information consistent with the warrant.  The

later review may require techniques, including but not limited to computer-assisted scans of the

entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

56.     Rolling Farms Cafe ("the Company") is a functioning company that conducts legitimate business. The seizure of the Company's computers may limit the Company's ability to conduct its legitimate business. As with any search warrant, I expect that this warrant will be executed reasonably. Reasonable execution will likely involve conducting an investigation on the scene of what computers, or storage media, must be seized or copied, and what computers or storage media need not be seized or copied. Where appropriate, officers will copy data, rather than physically seize computers, to reduce the extent of disruption.  If employees of the Company so request, the agents will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continuing function of the Company's legitimate business. If, after inspecting the computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it.

## **CONCLUSION**

57.     I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachment A and seize the items described in Attachment B.